# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 10, 2014 Session

## DONALD LESTER BENEDICT v. GRETCHEN MICHELLE BENEDICT

**Appeal from the Chancery Court for Hamilton County**
**No. 99-0673     W. Frank Brown, III, Chancellor**

---

**No. E2013-00978-COA-R3-CV-FILED-MAY 27, 2014**

---

This appeal concerns numerous post-divorce issues. Donald Lester Benedict ("Husband") filed a petition to modify his child support obligation against his former wife Gretchen Michelle Benedict ("Wife") in the Chancery Court for Hamilton County ("the Trial Court").[1] The parties eventually raised a host of issues about money, which were referred to a Special Master. Wife objected to certain of the Master's findings. Ultimately, the Trial Court sustained certain of Wife's objections to the Master's report and denied others. The Trial Court found, *inter alia*, that Husband was willfully or voluntarily underemployed. Husband appeals, and both parties raise several issues. We reverse the Trial Court as to its finding that Husband is willfully or voluntarily underemployed and those issues related to this finding. We remand for the Trial Court to make new determinations on these issues in light of our holdings that Husband was not willfully or voluntarily underemployed, and that Husband's income for purposes of child support is $75,000 per year as found by the Master. Otherwise, we affirm the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed, in Part, and, Reversed, in Part; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Phillip C. Lawrence, Chattanooga, Tennessee, for the appellant, Donald Lester Benedict.

Grace E. Daniell, Chattanooga, Tennessee, for the appellee, Gretchen Michelle Benedict.

---

[1]The parties have been divorced for quite some time. Nevertheless, we refer to them as Husband and Wife for convenience.

# OPINION

## Background

Husband and Wife divorced in September 2000. Two children ("the Children") were born from the marriage. The MDA and divorce judgment contained many obligations for Husband to Wife, among them: 1) child support of $3,200 per month effective June 1, 2000; 2) health and dental insurance for the Children; 3) private education for the Children; 4) funds for the Children to attend college; 5) rehabilitative alimony of $3,400 per month from August 1, 2000 through August 1, 2005; 6) indemnify Wife on debt to Pioneer Bank; and, 7) make payments for a 1999 Mercedes-Benz. Wife was awarded the marital residence. Their divorce notwithstanding, the parties resumed living together in June 2002. Wife and the Children moved in with Husband at his home. In 2003, Husband, Wife, and the Children moved into Wife's home at Shadow Walk Drive in Chattanooga, Tennessee. Also in 2003, Husband filed for bankruptcy. The parties stopped living together in July 2006.

In January 2007, Husband filed a petition to modify child support. Husband alleged that his income had decreased substantially and that Wife now was working. Wife filed an answer and counterclaim alleging that Husband had unclean hands and had failed to pay child support and alimony as ordered. Wife acknowledged that the parties had resumed living together for a while and that she was working. In November 2007, the Trial Court cut Husband's child support obligation from $3,200 per month to $1,900 per month pending trial. For his part, Husband denied being behind on child support or alimony. In May 2008, Wife filed a petition for contempt alleging that Husband failed to pay fees for one of the Children to attend school. Husband filed a response, alleging a reduction in income and asking for removal of his responsibility to pay tuition.

In April 2009, the Trial Court entered an order referring numerous issues in the case to a Master. The Master heard the case on several dates in 2010. We will not recount herein the whole breadth of testimony in this immensely litigious case, but confine ourselves to that relevant for review. The Master heard evidence about the parties' history and financial circumstances. Husband's income in 2000 was $350,000 per year. Husband at that time worked for Adams Lithography. Husband's work was commission-based. In 2002, Husband lost his job at Adams when the major client left Adams. Between 2002 and 2009, Husband worked in a variety of jobs. Husband opened Five-0-5 Marketing, LLC, an advertising agency, and Fireball Business Services, a printing company. The businesses ultimately did not thrive. Husband's income was as follows: 2005–$102,943, 2006–$205,143, 2007–$2,188, 2008–$24,954. By 2009, Husband returned to Adams and earned $75,000 per year. As of 2009, Wife was earning around $17,000 per year.

In March 2011, the Master entered his order. Husband's child support was set at $1,259 per year based on his salary at Adams of $75,000 per year. The Master ruled that Husband's obligation for private school tuition, college tuition, the second mortgage, and lease payments and residuals on the Mercedes were discharged in bankruptcy.

In January 2013, the Trial Court entered its memorandum opinion and order resolving Wife's objections to the Master's findings. The Trial Court held that the Master erred in calculating Husband's income and that Husband was willfully or voluntarily underemployed. The Trial Court held, *inter alia*: 1) Husband's income was his actual $75,000 salary at Adams plus an imputed $144,362 for a total of $219,362; 2) there was no substantial and material change in circumstances to modify Husband's private school tuition obligation; 3) Husband owed Wife $33,853.98 for tuition; 4) the college tuition obligation was discharged by Husband's bankruptcy; 5) the private school tuition obligation was not discharged in bankruptcy; 6) the debt on the second mortgage to Pioneer Bank was not discharged in bankruptcy; 7) although Husband's payment for the Mercedes-Benz was not discharged in bankruptcy, he satisfied his obligations under the MDA by providing Wife with a Ford Windstar van; 8) Husband owed child support arrearage of $7,548.92; 9) Husband owed medical expenses of $7,932.67; and, 10) Husband owed $44,150.64 for the second mortgage.

Wife filed an application for attorney's fees in the amount of $71,186.50. In March 2013, the Trial Court awarded Wife $44,568 in attorney's fees. Husband appealed to this Court.

## Discussion

Although not stated exactly as such, Husband raises five issues on appeal: 1) whether the Trial Court erred in finding that Husband was willfully or voluntarily underemployed so as to impute to him an income to create a child support obligation of $2,045 per month retroactive to February 2007; 2) whether the Trial Court erred in its modification of Husband's child support and award of child support arrearage; 3) whether the Trial Court erred in finding that Husband was not entitled to a modification of his obligation to pay for private school tuition and an arrearage for private school tuition; 4) whether the Trial Court erred in finding that Husband's obligation for payment of the second mortgage was not a debt discharged in bankruptcy; and, 5) whether the Trial Court abused its discretion in awarding Wife $44,568 in attorney's fees. Wife raises four issues of her own: 1) whether the Trial Court erred in finding that Wife waived her right to receive alimony during the period the parties resumed living together and in its calculation of alimony arrearage; 2) whether the Trial Court erred in finding that Husband was not in contempt; 3) whether the Trial Court erred in finding that Husband's obligation for college

-3-

tuition for the Children was not a domestic support obligation under 11 U.S.C. 523 (a)(5); and, 4) whether the Trial Court erred in finding that Husband was not required to pay any additional amount for the Mercedes. Wife also argues that the Trial Court erred in the amount owed to her on the second mortgage debt, an argument we will address when we address Husband's issue of the second mortgage.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). However, as to the concurrent finding of a chancellor and master, our standard of review is quite narrow as discussed in *In re Estate of Ladd*:

> Where there has been a concurrent finding of the Special Master and Chancellor, this Court may not disturb the concurrent findings. Tenn. Code Ann. § 27-1-113. A concurrent finding of a master and chancellor is conclusive on appeal, except where it is upon an issue not proper to be referred, where it is based on an error of law or a mixed question of fact and law, or where it is not supported by any material evidence. *Coates v. Thompson*, 713 S.W.2d 83, 84 (Tenn. Ct. App. 1986). This standard of review is similar to our standard when reviewing a jury verdict; we must affirm if there is any material evidence to support the trial court's concurrence. *See Id*.; Tenn. R. App. P. 13(d).

*In re Estate of Ladd*, 247 S.W.3d 628, 636-37 (Tenn. Ct. App. 2007).

The Trial Court's discretion is implicated for some of the issues on appeal. In *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Supreme Court discussed the abuse of discretion standard at length, stating:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their

-4-

discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.,* 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

We first address whether the Trial Court erred in finding that Husband was

willfully or voluntarily underemployed so as to impute to him an income to create a child support obligation of $2,045 per month retroactive to February 2007. As this Court explained in *Richardson v. Spanos*:

> Prior to the adoption of the Child Support Guidelines, trial courts had wide discretion in matters relating to child custody and support. *Hopkins v. Hopkins*, 152 S.W.3d 447, 452 (Tenn. 2004) (Barker, J., dissenting). Their discretion was guided only by broad equitable principles and rules which took into consideration the condition and means of each parent. *Brooks v. Brooks*, 166 Tenn. 255, 257, 61 S.W.2d 654, 654 (1933). However, the adoption of the Child Support Guidelines has limited the courts' discretion substantially, and decisions regarding child support must be made within the strictures of the Child Support Guidelines. *Berryhill v. Rhodes*, 21 S.W.3d 188, 193 (Tenn. 2000); *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996); *Smith v. Smith*, 165 S.W.3d 279, 282 (Tenn. Ct. App. 2004).

> \* \* \*

> Because child support decisions retain an element of discretion, we review them using the deferential "abuse of discretion" standard. This standard is a review-constraining standard of review that calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed. *State ex rel Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). Appellate courts do not have the latitude to substitute their discretion for that of the trial court. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). Thus, a trial court's discretionary decision will be upheld as long as it is not clearly unreasonable, *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001), and reasonable minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). Discretionary decisions must, however, take the applicable law and the relevant facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). Accordingly, a trial court will be found to have "abused its discretion" when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

*Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). The *Richardson* Court observed that the burden is on the custodial parent to prove that the obligor parent is willfully or voluntarily underemployed. *Id*. at 727 (citing *Demers v. Demers*, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003)). *See also Wilson v. Wilson*, 43 S.W.3d 495, 497 (Tenn. Ct. App. 2000) ("Although there is no requirement that a parent intended to avoid their child support obligations by their actions, we do think that willful or voluntary unemployment or underemployment must result from an intent on the part of the parent to reduce or terminate his or her income.").

The Child Support Guidelines provide that imputing income to a parent when calculating child support is appropriate: "If a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed …." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i)(I). When making a determination of willful or voluntary unemployment or underemployment, a trial court may consider:

> (I) The parent's past and present employment;
>
> (II) The parent's education, training, and ability to work;
>
> (III) The State of Tennessee recognizes the role of a stay-at-home parent as an important and valuable factor in a child's life. In considering whether there should be any imputation of income to a stay-at-home parent, the tribunal shall consider:
>
>> I. Whether the parent acted in the role of full-time caretaker while the parents were living in the same household;
>>
>> II. The length of time the parent staying at home has remained out of the workforce for this purpose; and
>>
>> III. The age of the minor children.
>
> (IV) A parent's extravagant lifestyle, including ownership of valuable assets and resources (such as an expensive home or automobile), that appears inappropriate or unreasonable for the income claimed by the parent;
>
> (V) The parent's role as caretaker of a handicapped or seriously ill child of that parent, or any other handicapped or seriously ill relative for whom that parent has assumed the role of caretaker which eliminates or substantially reduces the parent's ability to work outside the home, and the need of that parent to

continue in that role in the future;

(VI) Whether unemployment or underemployment for the purpose of pursuing additional training or education is reasonable in light of the parent's obligation to support his/her children and, to this end, whether the training or education will ultimately benefit the child in the case immediately under consideration by increasing the parent's level of support for that child in the future;

(VII) Any additional factors deemed relevant to the particular circumstances of the case.

Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(iii).

The Trial Court, holding that the Master miscalculated Husband's potential income, stated relative to this issue:

[H]ere, the court is not persuaded by Mr. Benedict's argument as to his income. The evidence of consistently large annual incomes in prior years due to his entrepreneurial skill and marketing knowledge convinces the court that he has the potential to earn equivalent sums now. As in *Demers*, simply because his business ventures had one or two bad years after many years of good years, does not convince the court that Mr. Benedict will be unable to earn larger amounts in the future. Indeed, the evidence presented to the court in the form of accounting records for his businesses, and the testimony of Michelle Camp, CPA convince the court that Mr. Benedict was earning more money from his companies than his tax records reflect. Primarily, the court notes that Mr. Benedict's personal draws from Five-0-5 Marketing in 2008 were $85,468.38, despite listing his income for tax purposes as $24,954 and a depreciation expense of $69,715 for Fireball. Depreciation is not an allowable deduction from income in calculating income for child support purposes. In the Schedule C portion of Mr. Benedict's 2007 tax return for Five-0-5 Marketing, LLC, there is no statement of who was paid wages of $196,305.00. It is difficult to believe that a business that grossed $454,258.00 made only a profit of $78.00. Five-0-5 Marketing, LLC, did much better in 2008. On its gross receipts of $325,866.00, the company made a profit of $93,590.00. However, most of that profit was erased by the $73,911.00 loss sustained by Fireball Business Services, LLC. Part of Fireball's expenses was $69,715.00 in depreciation. If the depreciation is eliminated, as required by the child support guidelines, then the loss is only $4,196.00, which reduces the profit from Five-0-5 to $89,394.00, which would have been Mr. Benedict's

-8-

income instead of the stated $19,679.00. Further, his draws for 2009 totaled $29,134.50 despite claiming his income was only $21,833 based on his wages from Adams Lithographing alone. Accordingly, the court does not find Mr. Benedict's own accounting of his income for 2007-2009 credible.

Moreover, the court finds support for its decision to impute income in Mr. Benedict's own 2007 loan application. Mr. Benedict's 2007 tax return states that he earned a total of $2,188.00 for the year. However, the loan application for his condo purchase, filled out in 2007 states that his monthly income was $15,000. Indeed, Mr. Benedict claimed he had a $9,000 monthly income on his 2008 income and expense statement. However, he explained this $9,000 "was in fact the draws against the loans to his company from [his line of credit] that he had to make to cover his living expenses." Thus, presumably the stated monthly income of $15,000 on his loan application referred to the draws against the line of credit as well. However, Mr. Benedict must have believed he would shortly return earning close to $15,000 per month in actual income, in light of (a) the length of the loan term for which he was applying (360 months), and (b) the fact that the interest rate on the money from the line of credit was 8%, but the interest rate on the loan for which he was applying was a lesser 5.85%.

Additionally, the court agrees with Ms. Benedict that it is disingenuous for Mr. Benedict to argue that the loan proceeds and "draws" from his companies are not "income" for the purpose of calculating child support, but claim they are "income" for the purposes of obtaining a loan and for paying his other personal expenses. Thus, the court cannot affirm the Master's Report, which sets Mr. Benedict's salary at $75,000 for the purposes of calculating child support. Instead, the court finds that Mr. Benedict is willfully underemployed and imputes income to Mr. Benedict in the amount of $144,362.00 per year to make his total annual income $219,362.00, or the average of his total incomes listed on line 22 of his 2006 ($205,143) and 2005 ($102,943) tax returns and his income on which child support was originally based in 2000, $350,000. The court makes its imputation calculation based on these numbers because these are the only evidence of Mr. Benedict's pre-2007 annual incomes before the court, and because the court does not find Mr. Benedict's testimony or reports of his income for 2007-2009 to be accurate or credible. (Internal citations omitted).

From our review of the law and facts of this case, several things seem evident. A finding of underemployment is fact-intensive. Also, the burden is on the support recipient,

here Wife, to prove underemployment. It is not sufficient to point out that Husband once earned a great deal more money than he does currently. There must be some evidence in the record to show that Husband is capable of earning more and is refraining from acquiring this better-paying work to reduce or terminate his income.

The record reveals that Husband's earnings took a major hit over the course of the decade after his divorce. Husband went from earning $350,000 per year to $75,000 per year at Adams. In the interim, his different enterprises eventually floundered. The evidence in the record on appeal does not support a finding that Husband intentionally torpedoed his career prospects. Rather, it appears Husband has tried and failed to reestablish some measure of his previous lifestyle. Husband filed for bankruptcy a few years after the divorce, as well. In its order, the Trial Court questioned the credibility of Husband's accounting of his income for the relevant years. However, the Trial Court did not identify any discrete facts which would tend to support a finding of underemployment resulting in Husband's income being set at anything greater than the $75,000 he earned at Adams. For example, the Trial Court states that "simply because his business ventures had one or two bad years after many years of good years, does not convince the court that [Husband] will be unable to earn larger amounts in the future." The proof is overwhelming that Husband's businesses did not just have one or two bad years, but instead eventually did so poorly that Husband closed them. The Trial Court also expressed incredulity at Husband's assertions. For example, the Trial Court stated that "[i]t is difficult to believe that a business that grossed $454,258.00 made only a profit of $78.00." We found nothing in the record to support this belief of the Trial Court that a business grossing over $450,000 a year must make a profit or that the more the business grosses, the greater its profit will be. This is an assumption unsupported by any facts in the record, particularly as applies to Husband's now failed businesses. In our view, the record does not suffice to show willful underemployment by Husband. It should be noted that the Trial Court did not hear Husband testify. The Trial Court relied on the record of the testimony given before the Master, and we, therefore, are not required to defer to the Trial Court's credibility determinations as to Husband.

In calculating Husband's income, the Trial Court added his salary of $75,000 to an imputed income of $144,362 to reach $219,362. We do not believe this is the correct way to go about determining Husband's income. As noted by Husband, he either is earning a salary of $75,000 or is an entrepreneur capable of earning $144,362, but not both at the same time. The Master found Husband's income for purposes of child support to be $75,000 per year. We believe the preponderance of the evidence supports the Master's finding, and the Trial Court erred in setting aside that finding by the Master. This of course does not settle once and for all time the issue of Husband's income. Husband perhaps will earn more money in the future. However, under the evidence in the instant appeal, we find that Husband's income for child support purposes is $75,000 per year.

We hold that the Trial Court erred in finding that Husband was willfully or voluntarily underemployed. Because of the close nexus between this issue and Husband's next two issues (whether the Trial Court erred in its modification of Husband's child support and award of child support arrearage; and, whether the Trial Court erred in finding that Husband was not entitled to a modification of his obligation to pay for private school tuition and an arrearage for private school tuition), those issues are pretermitted as they are to be considered anew by the Trial Court on remand in proceedings as necessary consistent with this Opinion.

We next address whether the Trial Court erred in finding that Husband's obligation for payment of the second mortgage was not a debt discharged in bankruptcy. The Trial Court conducted the following thorough analysis relative to this issue:

The Sixth Circuit has held that an ex-husband's obligation to pay the second mortgage on the marital home and the car loan for the ex-wife's vehicle does not constitute "spousal support" under the factors listed in *Fitzgerald*, where the evidence showed they were primarily promises to pay the debts of the ex-spouse rather than to support. *In re Jestice*, 168 F. App'x 39, 42-43 (6th Cir. 2006). The court focused its analysis on the fact that these obligations were not "structured as direct payments to [ex-wife], but rather as assumption of third-party debts." *Id*. at 42. Although there was some evidence the parties intended the assumption of debt to be in lieu of support, the court found the countervailing evidence in the divorce decree, expressly stating that no support obligation was to be awarded, weighed heavily against a finding of support. *Id*. However, in *Woosley v. Woosley*, No. CIV-3:09-0910, 2010 WL 500423 (M.D. Tenn. Feb. 5, 2010), the District Court for the Middle District of Tennessee held that a debtor's promise to pay an ex-spouse's car payment was non-dischargeable as spousal support because the debt was "certainly related" to the divorce agreement as it was referenced therein and there was evidence the ex-spouse took less money in alimony due to her reliance on the debtor paying her car payment. Thus, it seems the inquiry as to the dischargeability of such obligations turns on whether the obligation was *intended to be in lieu of* a greater spousal support payment.

A.      *The Second Mortgage Payment*

The court holds that Mr. Benedict's obligation to pay the second mortgage was in the nature of support under similar analysis as *Woosley*, and therefore a domestic support obligation that was not discharged by Mr. Benedict's bankruptcy. The Shadow Walk property was to be the home place

of Ms. Benedict and the two minor children. There were two mortgages on the home. Mrs. Benedict agreed to pay the first mortgage and Mr. Benedict agreed to pay the second mortgage. Further, Mr. Benedict agreed to hold Ms. Benedict harmless and to indemnify her from the claims of the second mortgagee, then Pioneer Bank.

> B.      *Credit for Second Mortgage Payments.*

According to a summary of the amount of the second mortgage to AmSouth and First Tennessee, Mr. Benedict contends that he spent $24,923.43 on the second mortgage. The court does not know what part was interest and what part was principal. Ms. Benedict points to the lack of evidence to support Ms. Benedict's alleged payments on the second mortgage. Mr. Benedict claims that he was no longer required to pay this debt after he received his discharge in bankruptcy. Therefore, he should receive credit for these monies against the alimony and child support balances that accrued after March 13, 2003. The court doubts he could receive any credit against the child support obligation under the "necessaries" test.

Ms. Benedict testified that the property was re-financed in 2007 and she did not withdraw any additional amounts or obtain any additional loans at that time. She testified that she had to refinance the mortgage because the interest rate on the Pioneer Bank loan was a variable rate. The current balance owed is $42,024.44, which includes an additional $10,800 withdrawn by Mr. Benedict on the loan after the divorce. He should not have made a loan on realty owned by someone else.

First, if Mr. Benedict's payment of the second mortgage is in the nature of alimony or support, then he would not be entitled to any credit against any other debt. He would have owed that payment as a matter of support. Second, if the payment is not alimony or support, then the court may not be able [to] characterize it as a payment entitling Mr. Benedict to credit. Until July of 2006, he was living with Ms. Benedict at her home. If the parties' cohabitation and agreement prohibits enforcement of the alimony order, then Mr. Benedict cannot "eat his cake and keep it" also. He was paying part of the overhead while the parties cohabited. Mr. Benedict also told Ms. Benedict that he felt he was "100% responsible" for the second mortgage. Trial Exhibit 36 shows that Ms. Benedict paid five payments of $425.24 each after cohabitation ended. She is due reimbursement for this $21,262.00 plus the current balance due of $42,024.44 for a total due of $44,150.64. (Some internal citations

omitted).

The evidence does not preponderate against the Trial Court's findings and ultimate holding relative to this issue. Wife made payments when Husband failed to pay the second mortgage. Wife was at risk of losing her home. The evidence reflects that the second mortgage obligation was in the nature of support, and thus was not discharged in bankruptcy. Wife argues on appeal that she should be awarded an additional $14,002.08 as reimbursement for payments she made on the second mortgage. The evidence does not preponderate against this figure of $44,150.64 as found by the Trial Court, and, therefore we do not disturb the Trial Court's figure. We affirm the Trial Court as to this issue.

Husband's final issue is whether the Trial Court abused its discretion in awarding Wife $44,568 in attorney's fees. Tenn. Code Ann. § 36-5-103(c) provides:

> (c) The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn. Code Ann. § 36-5-103(c) (2010). Pursuant to the statute, we review this issue raised on appeal for abuse of discretion. *Id.* Husband, among other things, argues that the Trial Court erred by awarding Wife attorney's fees without determining whether the award applied only to areas where Wife prevailed. Wife incurred considerable expense in this matter, and was successful, to an extent, in enforcing the decree for alimony and/or child support both below and on appeal. There is no hint her fees were unreasonable. It was within the discretion of the Trial Court to award Wife attorney's fees as it did. We hold that the Trial Court committed no reversible error in its award of attorney's fees to Wife.

We next address Wife's issues. First, we address whether the Trial Court erred in finding that Wife waived her right to receive alimony during the period the parties resumed living together and in its calculation of alimony arrearage. On the alimony arrearage, the Trial Court stated:

> The parties began living together in June of 2002 when Ms. Benedict and the children moved into Mr. Benedict's home. On page 19, the Master

stated that the parties reunited in May of 2002. The parties separated again in July of 2006. The court ruled that Mr. Benedict would not owe Ms. Benedict any alimony while they were living together. On January 6, 2010, the court found that Ms. Benedict waived her right to alimony between June 2002 to July 2005. According to the MDA, the alimony obligation terminated in July 2005 <u>before</u> they separated in July of 2006. (Internal citations omitted).

The issue of alimony in this case is somewhat unusual in that the parties cohabited shortly after their divorce for several years. During this time of cohabitation, the alimony provisions of the MDA did not proceed as originally planned. The record reflects that the parties had an agreement regarding payment of alimony in the context of their cohabitation. This agreement should be recognized and given effect. Wife wishes to have received the financial benefits of her and the children having lived with Husband after the divorce and also receive her awarded alimony as if Husband had not provided financially for her during their post divorce years together. The evidence does not preponderate against the findings of the Trial Court and its ultimate holding relative to this issue, and we affirm the Trial Court.

We next address whether the Trial Court erred in finding that Husband was not in contempt. The Master and the Trial Court were in agreement on this agreement. The record reflects that Husband has made efforts to comply with his obligations. Moreover, there has been considerable dispute as to what his obligations are and whether they should be altered. Given our limited standard of review as to these concurrent findings of the Trial Court and the Master, there is no basis in the record to establish that Husband should be held in contempt, and we decline to hold that the Trial Court erred in failing to hold Husband in contempt. Wife's argument on this issue is without merit. We affirm the Trial Court.

We next address whether the Trial Court erred in finding that Husband's obligation for college tuition for the Children was not a domestic support obligation under 11 U.S.C. 523 (a)(5). As pointed out by Husband, this Court has stated:

While a parent generally has no legal duty to support a child past the child's majority, *Blackburn v. Blackburn*, 526 S.W.2d 463, 465 (Tenn. 1975), a parent may contractually extend his or her support obligation beyond that imposed by law. *Penland v. Penland*, 521 S.W.2d 222, 224 (Tenn. 1975); *Hawkins v. Hawkins*, 797 S.W.2d 897, 898 (Tenn. Ct. App. 1990). Payment of college expenses is an appropriate subject for an agreement between a husband and wife going through a divorce. *Penland*, 521 S.W.2d at 224; *Hathaway v. Hathaway,* 98 S.W.3d 675, 678 (Tenn. Ct. App. 2002). Such an agreement is binding on the parties and constitutes "a contractual obligation outside the

-14-

scope of the legal duty of support during minority and retains its contractual nature . . . ." *Penland*, at 224; *Hathaway*, at 678. As with property settlement agreements generally, one that includes a provision on college expenses is subject to the same rules of contract interpretation as any other contract. *Hathaway*, 98 S.W.3d at 678.

*Pylant v. Spivey*, 174 S.W.3d 143, 151 (Tenn. Ct. App. 2003).

We are persuaded by Husband's argument that Tennessee law regards an obligation of this kind as contractual. Husband's obligation for college tuition could extend well into the Children's adulthood. In theory, the Children could avail themselves of a claim to Husband to support their college education in middle age or later. The college tuition obligation was in the nature of a contract rather than support. This obligation does not appear to be a support obligation as such, and thus is dischargeable. *See In re Sholes*, No. 92-5610, 1993 WL 15123 (6th Cir. Jan. 25, 1993). We affirm the Trial Court.

The final issue we address is whether the Trial Court erred in finding that Husband was not required to pay any additional amount for the Mercedes. Husband was to provide Wife with the Mercedes under the MDA. The Trial Court held, however, that the obligation was use of the Mercedes. When the Mercedes was repossessed, Husband nevertheless provided wife with adequate substitute vehicular transportation. This complied with the substance of Husband's obligation. We believe the Trial Court ruled correctly when it declined to require Husband to pay any additional amounts on the Mercedes. The evidence does not preponderate against the Trial Court's findings as to this issue. Husband effectively fulfilled his obligations in this area. We affirm the Trial Court.

In summary, we reverse the Trial Court as to its holding that Husband was willfully or voluntarily underemployed, and those two subsequent issues related to this determination. We find that Husband's income for child support purposes is $75,000 per year as found by the Master. We remand for the Trial Court to conduct further proceedings as necessary consistent with this Opinion. We affirm the judgment of the Trial Court on all other issues.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and, reversed, in part, and this cause is remanded to the Trial Court for further proceedings as necessary consistent with this Opinion. The costs on appeal are taxed one-half against the Appellant, Donald Lester Benedict, and his surety, if any, and one-half against the Appellee, Gretchen Michelle Benedict.

_____
D. MICHAEL SWINEY, JUDGE